UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____



CYNTHIA ABBOTT,

                Plaintiff,

       v.

WYOMING COUNTY SHERIFF'S
OFFICE,

                Defendant.

_____

**DECISION AND ORDER**

1:15-CV-00531 EAW

## INTRODUCTION

Plaintiff Cynthia Abbott ("Plaintiff") brings this action against defendant Wyoming County Sheriff's Office ("Defendant"), alleging that she was discriminated against in her employment due to disability and retaliated against when she complained of the discrimination. (Dkt. 1). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 39). For the reasons that follow, the Court grants in part and denies in part Defendant's motion.

## FACTUAL BACKGROUND

The following facts are taken from Defendant's Statement of Undisputed Material Facts (Dkt. 39-4), Plaintiff's responses to Defendant's statement (Dkt. 49), Plaintiff's Counterstatement of Material Facts (*id.*), Defendant's responses to Plaintiff's counterstatement (Dkt. 56-4), and the evidence submitted by the parties in support thereof.

Unless otherwise noted, these facts are undisputed. As is required at this stage of the proceedings, the Court construes all evidence in the light most favorable to Plaintiff.

Plaintiff was diagnosed with epilepsy as a child. (Dkt. 48 at ¶ 3). She obtained a bachelor of arts degree in criminal justice in May 2005, and was hired as a part-time corrections officer by Defendant in September 2009. (Dkt. 49 at ¶¶ 1, 3; Dkt. 56-4 at ¶¶ 1, 3). At that time, Farris Heimann ("Heimann") was the sheriff and Gregory Rudolph ("Rudolph") was the undersheriff. (Dkt. 39-4 at ¶¶ 13-14; Dkt. 49 at 32). As a requirement of her employment, Plaintiff underwent a physical examination on September 3, 2009, and was certified as "[f]it for duty as described by employer with significant pre-existing condition[.]" (Dkt. 49 at ¶ 4; Dkt. 56-4 at ¶ 4).

In March 2010, Plaintiff began a mandatory correctional officers' academy training program. (Dkt. 49 at ¶ 6; Dkt. 56-4 at ¶ 6). On March 21, 2010, during the defensive tactics portion of the training academy, Plaintiff suffered a seizure during which she acted confused and spoke with slurred speech. (Dkt. 49 at ¶ 6; Dkt. 56-4 at ¶ 6). Then-sergeant Matthew Case ("Case") was informed of Plaintiff's condition and relayed the information to Heimann; Case and Heimann had "multiple conversations about how to handle the situation." (Dkt. 49 at ¶ 7; Dkt. 56-4 at ¶ 7).

Plaintiff claims to have had a meeting with Case after her seizure in which he informed her that she was going to be terminated for having failed to complete the defensive tactics training. (Dkt. 49 at ¶ 9). Defendant denies that this conversation occurred, and notes that Case testified at his deposition that he did not recall any such meeting or conversation. (Dkt. 56-4 at ¶ 9). Plaintiff further claims to have had a meeting

with Rudolph wherein he angrily said "don't you think we would have liked to have known that you had seizures" and told her that she should lose her position. (Dkt. 48 at ¶ 16; Dkt. 49 at ¶ 11). Rudolph testified at his deposition that he did not recall discussing the issue of seizures with Plaintiff. (Dkt. 56-4 at ¶ 11). Ultimately, Plaintiff was allowed to complete the defensive tactics training at the training academy in Chautauqua County. (Dkt. 49 at ¶¶ 17, 20; Dkt. 56-4 at ¶¶ 17, 20).

In the early fall of 2012, Plaintiff's epilepsy medication was adjusted by her physician. (Dkt. 49 at ¶ 20; Dkt. 56-4 at ¶ 20). As a result of this medication change, Plaintiff experienced a seizure in October 2012, while at work. (Dkt. 49 at ¶ 20; Dkt. 56-4 at ¶ 20). The parties dispute whether Plaintiff reported this seizure to the officer in charge—Plaintiff testified that she made a contemporaneous report, while Defendant claims that it first became aware of the October 2012 seizure during Plaintiff's 50-h examination[1] on December 17, 2013. (Dkt. 49 at ¶¶ 21-22; Dkt. 56-4 at ¶¶ 21-22). On November 1, 2012, Rudolph sent an email to Heimann stating that he had "watched the whole 8hr shift of Abbott's on the dayshift of the 21st from the Dorm Post camera" and that he "did not see any indication of a medical problem." (Dkt. 49 at ¶ 23; Dkt. 56-4 at ¶ 23).

In December 2012, Heimann decided to retire from Defendant and in January 2013, he informed Rudolph that Rudolph would be appointed sheriff upon Heimann's retirement. (Dkt. 49 at ¶¶ 24-25; Dkt. 56-4 at ¶¶ 24-25). Beginning in March 2013, Heimann and Rudolph had conversations in which Heimann encouraged Rudolph to become involved in

---

[1]     New York General Municipal Law § 50-h provides for a pre-lawsuit examination where an individual makes a claim against a municipality.

employment decisions. (Dkt. 49 at ¶ 26; Dkt. 56-4 at ¶ 26). In June 2013, Rudolph informed Heimann that he wanted to appoint Case as jail administrator, and Heimann approved the decision. (Dkt. 49 at ¶ 29; Dkt. 56-4 at ¶ 39). Case was appointed without an interview. (Dkt. 49 at ¶ 29; Dkt. 56-4 at ¶ 29).

For more than two decades prior to June 2013, a seniority system had been used by Defendant to fill full-time corrections officer positions. (Dkt. 49 at ¶ 31; Dkt. 56-4 at ¶ 31). Interviews were not held—instead, the most senior part-time corrections officer "would simply be informed by the Sheriff that they had been promoted to full-time status." (Dkt. 49 at ¶ 31; Dkt. 56-4 at ¶ 31). On June 19, 2013, Samantha James ("James") was selected to fill a full-time corrections officer position pursuant to this seniority system. (Dkt. 49 at ¶ 33; Dkt. 56-4 at ¶ 33). James' appointment took effect July 6, 2013. (Dkt. 49 at ¶ 33; Dkt. 56-4 at ¶ 33). The parties dispute whether Rudolph was involved in James' appointment as a full-time corrections officer—Heimann testified at his deposition that it was Rudolph's decision to promote James (*see* Dkt. 50-1 at 371), while Rudolph testified that he was not involved in James' appointment (*see* Dkt. 51 at 116).

On July 2, 2013, Case, in his new role as jail administrator, emailed the three female part-time corrections officers to notify them of an upcoming open position for a full-time corrections officer. (Dkt. 49 at ¶ 35; Dkt. 56-4 at ¶ 35). Plaintiff was then the most senior part-time corrections officer. (Dkt. 48 at ¶ 23). However, the seniority system was not followed in filling this position. Instead, Rudolph tasked Case with developing an interview process. (Dkt. 49 at ¶ 40; Dkt. 56-4 at ¶ 40). In developing this interview process, Case worked with Denise Morley ("Morley"), Defendant's director of human

resources. (Dkt. 49 at ¶¶ 49-50; Dkt. 56-4 at ¶¶ 49-50). On July 8, 2013, Morley sent an email to Heimann, copied to Rudolph, in which she stated that she had "been talking with Matt Case about his interviews and the issue of one of the PT CO's [sic] who has epilepsy and has applied for full time." (Dkt. 53 at 364). Morley stated that her understanding was that Plaintiff had asked not to be placed in the control room, and that "we really should have medical documentation from her physician asking if she can perform all of the duties with or without reasonable accommodation." (*Id.*).[2] In that same email, Morley discussed modifying the job description for corrections officers to include "[t]hings like escorting inmates and any other kind of inmate contact either on their own or with other CO's [sic]." (*Id.*).

Case ultimately developed an interview questionnaire with two parts—a job interview evaluation form requiring the interviewer to rate the candidate in various areas, and a list of nine questions for the job candidate. (Dkt. 49 at ¶ 56; Dkt. 56-4 at ¶ 56). One of the nine questions was "are you able to perform all aspects of your duties . . . if you answer NO, then please note what accommodations would be needed to work in those areas." (Dkt. 49 at ¶ 56; Dkt. 56-4 at ¶ 56).

Plaintiff was interviewed by Rudolph and Case for the open full-time corrections officer position on July 9, 2013. (Dkt. 49 at ¶¶ 61, 63; Dkt. 56-4 at ¶¶ 61, 63). At that time, she had been employed as a part-time corrections officer for almost four years. (Dkt.

---

[2] Plaintiff denies ever having asked not to be placed in the control room. (*See* Dkt. 48 at 31).

49 at ¶ 61; Dkt. 56-4 at ¶ 61). Plaintiff claims that Rudolph asked her questions about her epilepsy during the interview. (Dkt. 48 at ¶ 33).

The parties dispute Plaintiff's employment record—Plaintiff claims that prior to July 2013, she had received only one warning notice, on September 18, 2010, for having called in 50 minutes before a scheduled shift due to a sick child, rather than one hour, as required by policy (Dkt. 49 at ¶ 62), while Defendant takes the position that Plaintiff called in only 40 minutes ahead of her shift and that she also received a note to file for failing to report to work on a separate occasion in September 2010 (Dkt. 56-4 at ¶ 62).

On July 10, 2013, Cheryl Lindsey ("Lindsey") was interviewed for the full-time corrections officer position by Rudolph, Case, and Sergeant Horton ("Horton"). (Dkt. 49 at ¶ 68; Dkt. 56-4 at ¶ 68). Lindsey had only two years of experience as a corrections officer and possessed a degree in cosmetology. (Dkt. 49 at ¶ 69; Dkt. 56-4 at ¶ 69).

On July 11, 2013, Teresa Jagusiak ("Jagusiak") was interviewed for the full-time corrections officer position by Rudolph, Case, and Horton. (Dkt. 49 at ¶¶ 70-71; Dkt. 56-4 at ¶¶ 70-71). Jagusiak had been a part-time correction officer for approximately 3 years, and did not have a college degree, but instead possessed only a GED. (Dkt. 49 at ¶ 70; Dkt. 56-4 at ¶ 70).

There is a factual dispute regarding whether Plaintiff and the other candidates were consistently scored with respect to their interview answers. For example, Case testified that Plaintiff's and Lindsey's answers to the question "how do you avoid conflict with co-workers" were "essentially the same." (Dkt. 52 at 143). However, Lindsey was scored between "good" and "superior" on the quality of "professionalism" (Dkt. 54 at 78), while

Plaintiff was rated only "fair" (*id.* at 64). On Plaintiff's evaluation form, Case recorded that she "[f]reely gave medical information that at some pt. may have to be addressed." (Dkt. 54 at 65).

Lindsey was selected for the full-time corrections officer position, but declined due to "problems at home." (Dkt. 49 at ¶ 76; Dkt. 56-4 at ¶ 76). The position was then offered to Jagusiak. (Dkt. 49 at ¶ 76; Dkt. 56-4 at ¶ 76).

On July 19, 2013, Rudolph sent Morley an email in which he informed her that the interviews for the open full-time corrections officer position were complete. (Dkt. 49 at ¶ 77; Dkt. 56-4 at ¶ 77). Next to Plaintiff's name, Rudolph indicated that she was "the one you brought [labor attorney David Lippitt] in on because of a medical condition." (Dkt. 49 at ¶ 77; Dkt. 56-4 at ¶ 77). Rudolph further informed Morley that the position had been offered first to Lindsey and then to Jagusiak, and that Rudolph had heard that Plaintiff was upset she had not been hired and might pursue legal action. (Dkt. 49 at ¶ 78; Dkt. 56-4 at ¶ 78). Morley replied that "[t]he bottom line is that we have to address the accommodation being made for [Plaintiff]. We do that by getting her physician involved to review her job duties and determine if she's fit to do the entire job." (Dkt. 49 at ¶ 79; Dkt. 56-4 at ¶ 79). Morley also asked Rudolph if he had it documented "in performance evaluations or anywhere else" that "the other two officers outshine [Plaintiff]." (Dkt. 49 at ¶ 79; Dkt. 56-4 at ¶ 79).

One day later, on July 20, 2013, a minor incident in which Plaintiff allegedly turned her back on Jagusiak was documented by Sergeant Gregory Smith. (Dkt. 49 at ¶¶ 80, 82; Dkt. 56-4 at 80, 82).

Rudolph officially became acting sheriff of Defendant on July 31, 2013. (Dkt. 49 at ¶ 83; Dkt. 56-4 at ¶ 83).

On September 25, 2013, Plaintiff received a written notice for an absence alleged to have occurred on September 20, 2013. (Dkt. 49 at ¶ 84; Dkt. 56-4 at ¶ 84). The parties dispute whether Plaintiff had agreed to take a shift on that date. (Dkt. 49 at ¶ 84; Dkt. 56-4 at ¶ 84).

Plaintiff was written up again one day later, on September 26, 2013, for having missed a shift on September 24, 2013. (Dkt. 49 at ¶ 85; Dkt. 56-4 at ¶ 85). Again, Plaintiff denies ever having agreed to work the allegedly missed shift. (Dkt. 49 at ¶ 85; Dkt. 56-4 at ¶ 85). Plaintiff came in to cover the rest of this shift upon being called, but was nevertheless written up for being "absent" rather than "tardy." (Dkt. 49 at ¶ 85; Dkt. 56-4 at ¶ 85).

On October 17, 2013, Rudolph was notified that Plaintiff had filed a notice of claim against Defendant. (Dkt. 49 at ¶ 87; Dkt. 56-4 at ¶ 87). The next day, Case sent an email to Rudolph with the subject line "Abbott phone." (Dkt. 49 at ¶ 88; Dkt. 56-4 at ¶ 88). The content of the email reads, without further information or context, "13:12:00 on the 10th of October." (Dkt. 49 at ¶ 88; Dkt. 56-4 at ¶ 88). On October 21, 2013, Sergeant Gregory Smith drafted a non-contemporaneous memorandum to Case detailing an incident on October 10, 2013, in which Plaintiff purportedly used her cell phone and was short with a staff nurse. (Dkt. 49 at ¶ 90; Dkt. 56-4 at ¶ 90). When this incident occurred, Defendant did not have a formal policy prohibiting cell phone use. (Dkt. 49 at ¶ 93; Dkt. 56-4 at ¶ 93). There was a memo regarding cell phone use that had been issued on May 21, 2010 (Dkt.

49 at ¶ 94; Dkt. 56-4 at ¶ 94), but the parties dispute whether Plaintiff had ever been made aware of this memo. (*See* Dkt. 49 at ¶¶ 94-99); Dkt. 56-4 at ¶ 94-99). Notwithstanding the lack of a formal policy, Plaintiff was issued a warning in December 2013 for having used her cell phone in October 2013. (Dkt. 49 at ¶ 99; Dkt. 56-4 at ¶ 99). Plaintiff claims that numerous other corrections officers used their cell phones while on duty and were not similarly disciplined; Defendant disputes this claim. (Dkt. 49 at ¶ 100; Dkt. 56-4 at ¶ 85).

In November 2013, Case and Rudolph became aware that Defendant would have an open full-time corrections officer position. (*See* Dkt. 53-1 at 24). On November 13, 2013, a memo was printed and placed in Plaintiff's personnel file detailing an incident in May 2013 where a co-worker allegedly noticed that Plaintiff's face looked pale and her hands were shaking. (Dkt. 49 at ¶ 102; Dkt. 56-4 at ¶ 102). At his deposition, Case could not recall why this memo would have been printed in November when the incident occurred in May. (Dkt. 49 at ¶ 102; Dkt. 56-4 at ¶ 102).

On November 14, 2013, Horton sent Case a memo detailing a complaint against Plaintiff made by inmates; upon investigation, "the issue was closed due to credibility issues with the alleged complainants." (Dkt. 49 at ¶ 103; Dkt. 56-4 at ¶ 103).

On November 15, 2013, Case sent an email to Rudolph wherein he reported that Horton had called him at home the prior night to alert him that there were "possibly more issues with CO Abbott." (Dkt. 49 at ¶ 104; Dkt. 56-4 at ¶ 104). Case then asked Rudolph when they should start the hiring process for a new full-time corrections officer. (Dkt. 49 at ¶ 104; Dkt. 56-4 at ¶ 104). At his deposition, Case was asked if it was normal for him to alert Rudolph about possible issues, and he stated that he believed it was his "duty to let

[Rudolph] know if there's issues going on" because of "[Plaintiff's] lawsuit being filed." (Dkt. 49 at ¶ 105; Dkt. 56-4 at ¶ 105).

Plaintiff's 50-h examination was conducted on December 17, 2013. (Dkt. 49 at ¶ 106; Dkt. 56-4 at ¶ 106). During the examination, Plaintiff testified about her history of absent/petit mal seizures, including the incident in fall 2012 after her doctor adjusted her medication. (Dkt. 49 at ¶ 106; Dkt. 56-4 at ¶ 106). On December 20, 2013, Case, Rudolph, Morley, and Defendant's legal counsel had a conference call to discuss Plaintiff's testimony. (Dkt. 49 at ¶ 107; Dkt. 56-4 at ¶ 107). As a result of that conversation, Rudolph decided to place Plaintiff on administrative leave pending an independent medical examination. (Dkt. 49 at ¶ 108; Dkt. 56-4 at ¶ 108). In a memo to Plaintiff regarding her administrative leave, Rudolph stated that her testimony at the 50-h examination had brought to his attention information regarding her seizures and how they could potentially jeopardize institutional safety; however, Plaintiff claims that Defendant was aware of the nature of her seizures since 2010. (Dkt. 49 at ¶¶ 111-12; Dkt. 56-4 at ¶¶ 111-12).

On December 31, 2013, Case sent an email to Morley, copied to Rudolph, to which he attached an updated job description for a corrections officer. (Dkt. 53-1 at 41). Case's email states that "[a]s with what is currently transpiring with the law suit, I think that it only makes sense to update and change/add some verbiage" to the job description. (*Id.*).

Plaintiff was placed on administrative leave on January 10, 2014. (Dkt. 49 at ¶ 118; Dkt. 56-4 at ¶ 118). That same month, two full-time corrections officers were hired by Defendant; Plaintiff was not chosen for either position, in part because of the contested

warnings regarding absences and cell phone use described previously. (*See* Dkt. 56-4 at ¶ 119).

On March 24, 2014, Plaintiff underwent an independent medical examination by Dr. Robert Knapp, who opined that she was capable of performing the essential functions of a corrections officer, and cleared her to return to work without restrictions. (Dkt. 49 at ¶ 120; Dkt. 56-4 at ¶ 120). Although Plaintiff's administrative leave was ultimately paid, there was a delay in payment, and she did not receive any pay until March 28, 2014, more than two months after the leave began. (Dkt. 49 at ¶ 121; Dkt. 56-4 at ¶ 121). Plaintiff returned to work on April 1, 2014. (Dkt. 49 at ¶ 122; Dkt. 56-4 at ¶ 122).

A full-time corrections officer position became available in May 2014. (Dkt. 49 at ¶ 123; Dkt. 56-4 at ¶ 123). No interviews were conducted; instead, Defendant relied upon the interviews and evaluations that had been conducted in connection with the positions that were filled in January 2014. (Dkt. 49 at ¶ 123; Dkt. 56-4 at ¶ 123). Plaintiff was again not chosen for this position. (Dkt. 49 at ¶ 123; Dkt. 56-4 at ¶ 123).

On May 7, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). (Dkt. 39-4 at ¶ 3; Dkt. 49 at 30). On May 21, 2014, Rudolph received a copy of a complaint Plaintiff had filed with the EEOC. (Dkt. 49 at ¶ 124; Dkt. 56-4 at ¶ 124). The same day, Case sent Horton an email stating "you can do another warning notice on Abbott." (Dkt. 49 at ¶ 125; Dkt. 56-4 at ¶ 125). On May 22, 2014, Morley replied to Rudolph's email advising her of Plaintiff's EEOC complaint, stating "I just went through this agency with a former hospital employee and it was a joke and waste of time." (Dkt. 49 at ¶ 126; Dkt. 56-4 at ¶ 126). Also on May

22, 2017, Case sent an email to Rudolph regarding alleged further inmate complaints about Abbott; Case investigated these complaints but ultimately did not take any further action. (Dkt. 49 at ¶ 127; Dkt. 56-4 at ¶ 127).

On June 27, 2014, Case sent an email to all of Defendant's part time corrections officers advising them of a new full-time position. (Dkt. 49 at ¶ 128; Dkt. 56-4 at ¶ 128). Plaintiff again applied and was not selected. (Dkt. 49 at ¶ 129; Dkt. 56-4 at ¶ 129).

On November 26, 2014, another full-time opening was announced. (Dkt. 49 at ¶ 130; Dkt. 56-4 at ¶ 130). Letters of interest were due by December 5, 2014. (Dkt. 49 at ¶ 130; Dkt. 56-4 at ¶ 130). On December 8, 2014, Case emailed Rudolph to inform him that only Plaintiff and Paige Hayden ("Hayden") had applied for the position. (Dkt. 49 at ¶ 131; Dkt. 56-4 at ¶ 131). Interviews for the position were postponed. (Dkt. 49 at ¶ 134; Dkt. 56-4 at ¶ 134). On December 30, 2014, Case emailed Rudolph and asked "do you want me to reschedule interviews . . . or are we going to wait—we just have Abbott and Hayden for this opening." (Dkt. 49 at ¶ 133; Dkt. 56-4 at ¶ 133). Interviews were ultimately held on January 6, 2015. (Dkt. 49 at ¶ 134; Dkt. 56-4 at ¶ 134). Plaintiff again contends that the rating of candidates was inconsistent, which Defendant disputes. (Dkt. 49 at ¶¶ 135-37; Dkt. 56-4 at ¶¶ 135-37).

A second full-time corrections officer position opened up in January 2015, and ultimately Plaintiff and Hayden were both hired full-time. (*See* Dkt. 49 at ¶ 139; Dkt. 56-4 at ¶ 139).

On May 5, 2015, Horton drafted a memo for Plaintiff's file regarding an incident where Plaintiff left three inmates unattended at the officer's desk. (Dkt. 49 at ¶ 143; Dkt. 56-4 at ¶ 143).

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on June 17, 2015. (Dkt. 1). Plaintiff alleges the following claims: discrimination on the basis of disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"); hostile work environment based on disability in violation of the ADA; retaliation in violation of the ADA; and discrimination based on disability, hostile work environment, and retaliation in violation of the New York Human Rights Law, New York Executive Law §§ 290 *et seq.* (the "NYHRL"). (*Id.*). Plaintiff seeks, among other relief, punitive damages. (*Id.* at 17). Defendant answered on August 14, 2015. (Dkt. 4). Discovery was closed on May 15, 2018. (Dkt. 37). Defendant filed the instant motion for summary judgment on June 26, 2018. (Dkt. 39). Plaintiff filed her response on August 15, 2018 (Dkt. 46; Dkt. 47; Dkt. 48; Dkt. 49; Dkt. 50; Dkt. 51; Dkt. 52; Dkt. 53), and Defendant filed its reply on September 14, 2018 (Dkt. 56).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    Discrimination in Violation of the ADA

The Court considers first whether Defendant is entitled to summary judgment on Plaintiff's claim for employment discrimination in violation of Title I of the ADA. "Title I of the ADA . . . contains a general prohibition of discrimination against qualified individuals with disabilities in matters of job application, hiring, advancement, discharge, compensation, training and any other terms and conditions of employment." *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 448 (E.D.N.Y. 2002). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013) (quotation omitted). Pursuant to this analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

Here, Defendant argues both that Plaintiff cannot establish a *prima facie* case of disability discrimination, and that, in any event, it had legitimate, non-discriminatory, non-pretextual reasons for its various decisions related to Plaintiff's employment. The Court is unpersuaded by these arguments, for the reasons that follow.

### A.    *Prima Facie* Case of Discrimination

As one court in this Circuit recently explained, to establish a *prima facie* case of discrimination under the ADA:

> a plaintiff must show that: (1) her employer is subject to the ADA; (2) she
> was disabled within the meaning of the ADA; (3) she was otherwise qualified
> to perform the essential functions of her job, with or without reasonable
> accommodation; and (4) she suffered adverse employment action because of
> her disability.

*Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 612–13 (E.D.N.Y. 2017) (quotation

and alterations omitted). "A plaintiff suffers an 'adverse employment action' under the

ADA when 'he or she endures a materially adverse change in the terms and conditions of

employment.'" *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 434

(E.D.N.Y. 2015) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.

2000)). "A materially adverse change is a change in working conditions that is 'more

disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting

*Galabya*, 202 F.3d at 640). Failure to promote constitutes an adverse employment action

under the ADA. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)

("[D]iscriminatory failure to promote falls within the core activities encompassed by the

term 'adverse actions.'").

For purposes of the instant motion, Defendant has not disputed any of the first three

elements of an ADA discrimination claim. Instead, Defendant argues that Plaintiff has no

evidence that she was not promoted as a result of her disability, and accordingly cannot

establish a *prima facie* case of discrimination. The Court notes that after the filing of

Defendant's motion in this case, the Second Circuit held that the "but for" causation

standard, and not the "motivating factor" standard, applies to ADA claims. *Natofsky v.*

*City of New York*, 921 F.3d 337, 348 (2d Cir 2019). However, even under this more

exacting standard, the Court concludes that disputed issues of fact necessitate denying Defendant's summary judgment motion.

On a motion for summary judgment, "[t]he plaintiff's burden of establishing a *prima facie* case of employment discrimination is *de minimis*." *Chasse v. Computer Scis. Corp.*, 453 F. Supp. 2d 503, 514 (D. Conn. 2006). Here, the Court easily concludes that there is evidence giving rise to a reasonable inference of discrimination with respect to Defendant's repeated failure to promote Plaintiff, and that she has accordingly met the minimal burden of establishing a *prima facie* case of disability-based discrimination. In particular, assessing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Rudolph allowed James to be promoted under the long-standing seniority policy but then, within a matter of weeks, when Plaintiff would have been next-in-line for promotion, completely changed the procedure. Moreover, there is ample evidence in this case that the key decisionmakers (namely, Rudolph, Case, and Morley) looked disfavorably on Plaintiff's disability, including particularly the ongoing references to Plaintiff's epilepsy as an "issue" and the continuing questioning of Plaintiff's fitness for duty, despite the fact that she had been medically cleared at the outset of her employment. *See id.* (explaining that relevant factors in assessing whether an inference of discrimination can be drawn include "the timing of the adverse employment action," as well as "the sequence of events leading to the adverse employment action" and whether "the employer criticized the plaintiff's work performance in terms degrading to her protected class").

## B.     Pretext

Defendant further argues that it had legitimate, non-discriminatory reasons for failing to promote Plaintiff, and that there is no evidence these reasons were pretextual. Accepting for purposes of this motion that Defendant's identified reasons for its promotion decisions were legitimate and non-discriminatory, the Court nevertheless concludes that there are issues of fact as to whether those reasons were pretextual.

The burden of showing pretext is higher than that for setting forth a *prima facie* discrimination case, and "the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of the plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 255 (S.D.N.Y. 2015) (quotation and alteration omitted). In other words, the plaintiff must "produce adequate evidence to support a rational finding that the employer's explanation is false and that, more likely than not, discrimination was the real reason for the adverse action." *Fall v. New York State United Teachers*, 289 F. App'x 419, 421 (2d Cir. 2008).

In this case, Plaintiff has identified genuine factual issues as to whether the interview process developed by Case was applied consistently to the applicants for full-time positions. A rational factfinder could conclude, on the record before the Court, that Plaintiff was arbitrarily scored lower for similar answers. While there is nothing inherently unlawful about using subjective criteria in hiring decisions, the Second Circuit has acknowledged that "[a] subjective evaluation, besides being clear and specific, must also be honest." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001).

The scoring inconsistencies in this case create a question for a jury as to whether the evaluations used by Defendant meet this threshold. Moreover, the deviation from the seniority policy and the express inclusion of a question regarding the need for accommodations are further evidence that the interview process was designed to exclude Plaintiff, as is the delay in interviews that resulted when Plaintiff was one of only two candidates for a full-time opening. The Court further notes that Plaintiff's qualifications (namely, her experience and education) were superior, on paper, to those chosen for the full-time positions, and "[c]ourts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Id.* at 103 (further explaining that even where a credential gap is not so substantial as to create a genuine issue of material fact standing alone, "that does not mean the discrepancy is stripped of all probative value," and it can still be considered in bearing on the employer's credibility). Viewing the evidence in this case in its totality, the Court cannot say, as a matter of law, that no reasonable juror could conclude that Defendant did not want to hire Plaintiff full-time because of her seizures, and that it accordingly failed to promote her until left without any other viable alternative.

For all these reasons, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's ADA discrimination claim.

## III.   Hostile Work Environment Claim

Plaintiff also asserts a claim for a hostile work environment based on her disability. As an initial matter, the Second Circuit has "not yet decided whether hostile-work-

environment claims are cognizable under the ADA." *Dollinger v. New York State Ins. Fund*, 726 F. App'x 828, 831 (2d Cir. 2018). However, assuming that such a claim is viable, it is evaluated under the same standard as a claim for a hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII")—that is, the plaintiff must show conduct that:

> (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's disability.

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quotation and alteration omitted). "Whether a workplace is a hostile work environment under the provisions of the ADA requires consideration of the totality of the circumstances." *Giambattista v. Am. Airlines, Inc.*, 5 F. Supp. 3d 284, 294 (E.D.N.Y. 2014), *aff'd*, 584 F. App'x 23 (2d Cir. 2014).

In this case, Defendant seeks summary judgment on Plaintiff's hostile work environment claim based on the so-called *Faragher/Ellerth* affirmative defense. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). This affirmative defense, which has been applied to hostile work environment claims under the ADA, "has two elements: (1) the employer exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Wildman v. Verizon Corp.*, No. 1:05-CV-899 FJS/DRH, 2009 WL 104196, at *4 (N.D.N.Y. Jan. 14, 2009) (quotation and alteration omitted). The first of these elements can be satisfied by

"showing the existence of an antiharassment policy during the period of the plaintiff's employment," while the second can be satisfied by "proof that an employee has unreasonably failed to use the employer's complaint procedure." *Id.* (quotation omitted). "[T]he *Faragher/Ellerth* affirmative defense applies to supervisor harassment," *MacCluskey v. Univ. of Connecticut Health Ctr.*, 707 F. App'x 44, 47 (2d Cir. 2017), but cannot be invoked if "the supervisor's harassment culminates in a tangible employment action," *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101-102 (2d Cir. 2006) (quoting *Faragher*, 524 U.S. at 808).

In this case, Defendant has submitted evidence that it maintained an antiharassment policy at all times relevant to the instant matter and that Plaintiff was aware of this policy. (*See* Dkt. 39-2 at 16-26). Moreover, Plaintiff has not disputed that she failed to utilize the complaint procedure set forth therein. (*See* Dkt. 39-4 at ¶ 33; Dkt. 49 at 35). Indeed, Plaintiff's response to Defendant's motion for summary judgment fails to even discuss the *Faragher/Ellerth* defense. (*See* Dkt. 46 at 27-28). However, Defendant's submission fails to address the exception to the *Faragher/Ellerth* defense that arises where a supervisor's harassment culminates in a tangible employment action.

The Court has serious doubts that the record in this case supports a finding that the alleged conduct rose to the level of severe or pervasive harassment based on disability. It is not even clear to the Court what conduct Plaintiff is claiming rose to such a level. However, Defendant has not sought summary judgment on this basis, nor have the parties briefed it.

With respect to the *Faragher/Ellerth* affirmative defense, the Court cannot conclude at this point in time that it applies as a matter of a law. In particular, because it is not clear to the Court what conduct could arguably constitute severe or pervasive harassment, the Court is unable to assess whether that harassment in turn culminated in a tangible employment action, and Defendant has not addressed this issue at all in its briefing. Moreover, Plaintiff's failure to address the *Faragher/Ellerth* issue in her response does not relieve the Court of its burden of assuring that summary judgment is truly warranted. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."). On the current record, Defendant has not demonstrated its entitlement to summary judgment on Plaintiff's hostile work environment claim.

However, in light of the Court's serious misgivings about the viability of Plaintiff's hostile work environment claim, the Court will deny Defendant's motion without prejudice solely on this issue. If Defendant wishes, it may make a renewed motion for summary judgment only as to Plaintiff's hostile work environment claim by no later than October 25, 2019.

## IV. Retaliation in Violation of the ADA

Defendant further seeks summary judgment on Plaintiff's claim for retaliation in violation of the ADA. As the Second Circuit has explained:

> The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

*Treglia*, 313 F.3d at 719 (quoting 42 U.S.C. § 12203(a)). Claims for retaliation under the ADA "are analyzed under the same burden-shifting framework established for Title VII cases." *Id.* To prevail on a claim for retaliation under the ADA:

> First, the plaintiff must establish a *prima facie* case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.

*Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 267 (E.D.N.Y. 2015) (quotation omitted). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721. Then, "[i]f a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.*

## A.    Protected Activity

As an initial matter, Defendant contends that the first "protected activity" in which Plaintiff engaged is the filing of her notice of claim, and that any actions taken before that date cannot have constituted retaliation. Plaintiff argues in opposition that Rudolph's email to Morley on July 19, 2013, wherein he stated that Plaintiff was upset that she was not hired and might pursue legal assistance, is evidence of earlier protected activity. However,

Plaintiff has not provided any additional information regarding the content of any complaints she may have made in July 2013.

The Court agrees with Defendant that, on the current record, the earliest protected activity Plaintiff can establish she engaged in is the filing of her notice of claim. While it is true that "protected activity includes informal protests of discriminatory employment practices, including making complaints to management," any such informal complaints "must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [the ADA]." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (quotation omitted). Here, while it may be the case that Plaintiff complained about being passed over for promotion in July 2013, there is nothing in the record from which a reasonable factfinder could conclude that her complaint related to alleged discrimination on the basis of her disability, or that Rudolph understood her to be making such a complaint. To the contrary, Plaintiff herself characterizes the facts as Rudolph having merely "heard rumors that [Plaintiff] may pursue legal assistance." (Dkt. 46 at 29). Vague, secondhand rumors do not satisfy the specificity requirement to constitute protected activity. "The burden is on plaintiff to show that she was engaged in a protected activity, in order to avoid summary judgment." *Correa v. Mana Prod., Inc.*, 550 F. Supp. 2d 319, 331 (E.D.N.Y. 2008). In this case, Plaintiff cannot satisfy that burden prior to the filing of her notice of claim.

### B.    Adverse Employment Actions

Defendant next argues that the only "adverse employment action" that Plaintiff has suffered since the filing of her notice of claim is a failure to promote. Defendant

specifically argues that Plaintiff's placement on administrative leave and her receipt of various warnings do not constitute adverse employment actions as a matter of law. The Court disagrees.

First, with respect to Plaintiff's placement on administrative leave, contrary to Defendant's contention, the Second Circuit has not held that paid administrative leave cannot constitute an adverse employment action for purposes of an ADA retaliation claim. In fact, in *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), the case on which Defendant relies for its argument, the court declined to reach such a conclusion. *See id.* at 92 n.1 (explaining that the decision expressly does not conclude that "paid administrative leave can never be adverse"). Indeed, the *Joseph* court noted that "[a]n exceptionally dilatory investigation might constitute a material change in the terms and conditions of employment." *Id.* at 92. Similarly, the court in *Baum v. Rockland Cty.*, 161 F. App'x 62 (2d Cir. 2005) specifically did not reach the issue of "whether there might be . . . circumstances . . . in which" requiring a plaintiff to submit to a medical examination "could constitute an adverse employment action for purposes of . . . ADA retaliation." *Id.* at 64 n.2.

Here, the circumstances surrounding Plaintiff's paid administrative leave could lead a reasonable factfinder to conclude that it was a material change in the terms of her employment. In this regard, the Court finds it particularly significant that Plaintiff was not paid until the end of the administrative leave, meaning that she was without a paycheck for almost three months. Moreover, there is a factual dispute as to whether Defendant genuinely believed that administrative leave was necessary. On these facts, the Court is

not prepared to conclude as a matter of law that Plaintiff's placement on administrative leave did not constitute an adverse employment action.

Turning to Plaintiff's receipt of written warnings, "[r]eprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action," and "whether they do is typically a question of fact for the jury." *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (collecting cases). In particular, where warnings or negative performance evaluations "trigger some adverse consequences to plaintiff's employment, courts in this district have left it to the trier of fact to determine whether those consequences rise to the level of adverse employment action." *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 469 (S.D.N.Y. 2013). In this case, Defendant acknowledges that one of the cited reasons for Plaintiff not being promoted in January 2014 was because of the challenged written warnings. (*See* Dkt. 56-4 at ¶ 119). The Court finds that, under these circumstances, there is a question of fact as to whether these written warnings rose to the level of an adverse employment action.

## C.   Causal Connection

Defendant argues that Plaintiff cannot demonstrate that any adverse employment action was taken for retaliatory reasons. The Court disagrees and finds that Plaintiff has shown that genuine issues of material fact exist as to whether she was placed on administrative leave in retaliation for her complaints of discrimination. The Court finds the following particularly relevant in reaching this conclusion: there are factual disputes as to whether Rudolph's stated reason for placing Plaintiff on administrative leave was fabricated; the decision to place Plaintiff on administrative leave was made in extremely

- 26 -

close proximity to her testifying at her 50-h examination; there was a multiple week gap in between the decision being made and the administrative leave actually being commenced during which time Plaintiff continued to work, calling into question the assertion that the leave was necessary for institutional safety; and Defendant has offered no explanation for why, in November 2013, a memo was placed in Plaintiff's personnel file detailing an incident in May 2013 where a co-worker allegedly noticed that Plaintiff's face looked pale and her hands were shaking, which suggests that Defendant was trying to create the impression that Plaintiff was unfit for duty or having medical issues at work. The Court cannot say that a reasonable juror would be constrained to find for Defendant on Plaintiff's claim that she was placed on administrative leave for retaliatory reasons.

The Court further finds that genuine issues of material fact exist as to whether retaliation was the cause of the written warnings and associated failure to promote Plaintiff postdating her protected activity. While it is true that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), in this case there is evidence beyond temporal proximity to support Plaintiff's retaliation claims. For example, after being served with Plaintiff's notice of claim, it appears that Case began actively seeking out matters for which Plaintiff could be reprimanded, inasmuch as his email to Rudolph supports the inference that he was reviewing security footage looking for video of Plaintiff using her cell phone. There is also a factual dispute as to whether Plaintiff was treated differently with respect to cell phone use than other corrections officers. Case

himself acknowledged at his deposition that he was reporting potential issues with Plaintiff to Rudolph because of her lawsuit. A reasonable juror could conclude from this evidence that Plaintiff's complaints of discrimination caused Defendant to increase efforts to find reasons to reprimand Plaintiff, so as to ensure that she would not be promoted. Summary judgment on Plaintiff's claim of retaliation under the ADA is not warranted.

## V.  NYHRL Claims

Defendant also seeks summary judgment on Plaintiff's claims of disability discrimination and retaliation under the NYHRL. Generally speaking, "[t]he same standard applies to disability discrimination claims against an entity under both the ADA and the NYHRL." *Murphy v. N.Y. State Pub. Employees Fed'n*, No. 17-CV-628T JMT WD, 2019 WL 4257261, at *10 (N.D.N.Y. Sept. 9, 2019). Similarly, courts generally "analyze hostile work environment claims under the ADA and the NYHRL using the same standard that they apply to Title VII hostile work environment claims." *Guinup v. Petr-All Petroleum Corp.*, 786 F. Supp. 2d 501, 515 (N.D.N.Y. 2011).[3] Furthermore, retaliation claims under the NYHRL are generally "governed in this respect by the same standards as the ADA." *Treglia*, 313 F.3d at 719. Accordingly, for all the reasons already discussed, the Court denies Defendant's request for summary judgment on Plaintiff's discrimination,

---

[3]    Changes to the hostile work environment provisions of the NYHRL were signed into law on August 12, 2019, and are set to go into effect in early October. However, these changes are not retroactive and so do not impact the Court's analysis of Plaintiff's hostile work environment claim. *See https://www.nysenate.gov/legislation/bills/2019/s6577* (summarizing amendments).

retaliation, and hostile work environment claims under the NYHRL, without prejudice to the filing of a renewed motion addressed solely to the hostile work environment claim.

## VI.   Request for Punitive Damages

Finally, Defendant asks the Court to determine as a matter of law that Plaintiff cannot recover punitive damages from Defendant under either the ADA or the NYHRL. Plaintiff has not responded to this argument.

"Punitive damages are not available under . . . Title I of the ADA against a government, government agency or political subdivision." *Morales v. N.Y.C. Transit Auth.*, No. 05-CV-04097 ENV RER, 2008 WL 11433211, at *9 (E.D.N.Y. Mar. 10, 2008). Nor are punitive damages available against a municipality under the NYHRL. *See Hollis v. City of Buffalo*, 28 F. Supp. 2d 812, 826 (W.D.N.Y. 1998); *see also Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 332 (S.D.N.Y. 2001) (explaining that under New York law, "in the absence of an explicit statutory provision to the contrary, even a municipal subsidiary corporation—like the municipality itself—is exempt from the assessment of punitive damages"), *aff'd sub nom. Krohn v. N.Y.C. Police Dep't,* 372 F.3d 83 (2d Cir. 2004). Accordingly, the Court grants Defendant's summary judgment motion as to any claim by Plaintiff for punitive damages.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 39) is granted in part and denied in part. In particular, the Court denies Defendant's motion as to Plaintiff's claims of discrimination and retaliation under the ADA and the NYHRL. The Court further denies Defendant's motion with respect to Plaintiff's claim for a hostile work

environment under the ADA and the NYHRL, but without prejudice to the filing of a renewed motion for summary judgment addressing solely these claims by no later than October 25, 2019. The Court grants Defendant's motion with respect to any claim by Plaintiff for punitive damages.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 26, 2019
      Rochester, New York